IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| Patricia Karoue, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> Blue Cross Blue Shield of South ) <br> Carolina, *doing business as* ) <br> Companion Data Services, LLC ) <br> ) <br> Defendant. ) <br> _____) | Civil Action No. 3:13-1844-JFA-KFM <br><br> **REPORT OF MAGISTRATE JUDGE** |

       This matter is before the court on the defendant's motion for summary judgment (doc. 40) and motion for sanctions (doc. 52). Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civil Rule 73.02(B)(2)(g) DSC, this magistrate judge is authorized to review all pretrial matters in employment discrimination cases and submit findings and recommendations to the district court.

## PROCEDURAL HISTORY

       The plaintiff filed this action in state court, and the case was removed to federal court on July 5, 2013. In her complaint, the plaintiff alleged causes of action against her former employer for breach of contract, breach of the implied duty of good faith and fair dealing, breach of contract accompanied by a fraudulent act, and violation of the Americans with Disabilities Act ("ADA"). On February 25, 2014, the Honorable Joseph F. Anderson, Jr., United States District Judge, adopted the undersigned's recommendation and granted the defendant's motion for partial summary judgment on the contract-based claims (doc. 38). On March 11, 2014, the defendant filed a motion for summary judgment on the remaining ADA claim. On June 2, 2014, the plaintiff filed a response in opposition to the motion for summary judgment (doc. 49), and on June 12, 2014, the defendant filed its reply

(doc. 51). On July 8, 2014, the defendant filed a motion for sanctions based upon the plaintiff's failure to cooperate in discovery (doc. 52). The plaintiff filed a response in opposition on July 25, 2014 (doc. 53), and the defendant filed a reply on August 3, 2014 (doc. 55).

## **FACTS PRESENTED**

In May 2007, the plaintiff began working as a Sigma Systems contract employee assigned to work at Companion Data Services ("CDS")[1] in the position of Financial Analyst III under the supervision of now-Chief Financial Officer ("CFO") Jim Dotson (doc. 41-1, def. first req. for admissions ¶¶ 16-18).[2] In August 2007, the plaintiff applied for a position as Accountant IV working directly for CDS (*id*. ¶ 16). The plaintiff reported having a bachelor of arts degree, with post-baccalaureate accounting classes; a master of business administration degree; and dual masters of science degrees in database technology and systems engineering (*id*. ¶¶ 16-18). Mr. Dotson interviewed the plaintiff on October 10, 2008, and rated her education, presentation skills, communication skills, and general abilities as acceptable (doc. 40-3, Thompson decl). Mr. Dotson selected the plaintiff for the position, and CDS hired the plaintiff effective October 20, 2008. Also on October 20, 2008, the plaintiff completed a "Confidential Employee Profile II" form wherein she identified herself as not disabled (doc. 41-1, def. first req. for admissions ¶ 11).

At that time, CDS published its Corporate Policy Manual electronically (doc. 42-1, Padgett decl., pt. 1). The plaintiff had access to the manual (doc. 41-1, def. first req. for admissions ¶ 1), which contained a "Personal Conduct" policy (doc. 42-1, Padgett decl.,

---

[1] According to the defendant, Blue Cross and Blue Shield of South Carolina, it does not "d/b/a Companion Data Services, LLC" as indicated in the caption of the case. CDS is a wholly-owned subsidiary of Blue Cross and Blue Shield of South Carolina, and the defendant states that it should be identified in the caption as Companion Data Services, LLC (*see* docs. 3, 4).

[2] The plaintiff did not respond to the defendant's requests for admissions (*see* doc. 52 at p. 8 n. 2). Accordingly, they were deemed admitted. *See* Fed. R. Civ. P. 36(a)(3).

2

ex. 1). The policy required employees "to be professional and to conduct themselves with personal maturity," to exhibit a "positive attitude toward work, fellow employees and the company," and to "treat fellow employees and customers with consideration and dignity" (*id.*). CDS does not tolerate abusive, demeaning, or threatening behavior. CDS also published an "Our Values" policy in the manual, which required employees to comply with the standards of the Values policy, including effective communication and taking responsibility for actions (*id.*).

In May 2009, an internal customer of CDS complained to Mr. Dotson about the plaintiff's curt communication with him and asked that she be taken off the contract with that customer because he did not want to work with her (doc. 41-2, South Carolina Department of Employment and Workforce ("SCDEW") Tr. p. 45). In July 2009, on her first performance review, the plaintiff's manager, Mark Baker, rated her as "needs improvement" in the areas of "resourcefulness," "communications," and "leadership/influencing" because she needed to "make better use of the tools and staff in the area to complete [her] assigned tasks"; to "make sure that what [she was] attempting to discuss with others [was] clearly and concisely understood"; and to "[t]ake [her] organizational project skills and work on the communication to place [herself] in a higher leadership role" (doc. 41-1, def. first req. for admissions ¶ 15). Mr. Baker encouraged the plaintiff to improve her communication with others in the division (*id.*). Mr. Dotson approved the review. The final ratings included "needs improvement" ratings for resourcefulness, communications, and leadership/influencing, and an overall rating of 3.1 ("meets expectations") (*id.*).

Near the end of 2009, the plaintiff transferred to the cost accounting department, which involved a new role of providing analysis and reporting for all aspects of the Electronic Data Center ("EDC") and the use of the Corporate Data Center ("CDC"). The plaintiff's role included "understanding units usage, overhead costs, labor hours, inventory on fixed assets, and home office changes." The plaintiff was responsible for

3

activities associated with maintaining ledger accounts, developing financial statements and reports, analyzing financial data and reporting the results, compiling financial information, processing journal entries, and reconciling reports (doc. 41-1, def. first req. for admissions ¶ 14; doc. 42-1, Padgett decl., ex. 2)

The plaintiff's new supervisor, Mazen Cotran, counseled the plaintiff about her communication style. On January 26, 2010, Mr. Cotran asked the plaintiff via e-mail to perform certain work tasks. The plaintiff responded, "You keep asking me this. I keep telling you . . . I keep explaining this to you. There is nothing more I can do" (doc. 42-1, Padgett decl. ¶ 5 & ex. 3 at p. 3). Mr. Cotran replied, in relevant part:

> You gotta work on your responses being a tad softer. I'm not the only one that complains about this. I'm sharing this with you as a friend. I am always friendly and nice to you Patricia, but your responses are just always confrontational. . . . I'm not upset, but I am always walking on eggshells trying to work with you. Afraid that you may snap and give off some rude remark. You just walked in as I type this with the same type of comment: "why can't you understand what I'm trying to tell you." It's just your tone Patricia. Not sure what to suggest, but to just be a little softer in your responses.

(*Id*., ex. 3 at pp. 2-3). The plaintiff responded, "I keep trying to explain something and I am not heard. I can understand that someone cannot take the time to focus on a topic, but to outright deny the explanation I am giving is not in your best interest" (*id*., ex. 3 at p. 2). Mr. Cotran again suggested that the plaintiff use a more gentle tone and told her they could discuss it in person if she wished. He explained that others reacted to her tone the same way (*id*.).

Mr. Cotran consulted with Ruth Padgett, a Human Resources ("HR") Generalist for his area, who suggested that Mr. Cotran counsel the plaintiff to address the communication issue, her personal conduct, and her violation of the dress code policy by wearing "warm ups" and tennis shoes (doc. 42-1, Padgett decl. ¶ 6). On February 17, 2010, Mr. Cotran e-mailed the dress code policy to the plaintiff and reminded her she could not

4

wear those items to work, but if she had a legitimate medical reason for wearing them, she should contact HR for approval. (doc. 42-2, Padgett decl., ex. 4 at pp. 2-3). Ms. Padgett provided the plaintiff with an accommodation request form (*id.*, ex. 4 at pp. 6-8). The morning of February 18, 2010, the plaintiff responded that she had a serious foot issue, would get a doctor's note for HR, and would "contact an attorney and take care of this matter" (*id.*, ex. 4 at pp. 14-15). The plaintiff's demeanor with Mr. Cotran became more brusque in person and through e-mail (*id.*, ex. 4 at p.14). About 30 minutes later, the plaintiff e-mailed Mr. Cotran again, saying she had contacted HR and her podiatrist and asked if she was to report to work the following day (*id.*, ex. 4 at pp. 12-13). Mr. Cotran assured the plaintiff she was to report to work; he offered his general assistance, and suggested that faxing the doctor's note might speed up the medical certification process (*id.*, ex. 4 at p. 12). The plaintiff replied that she had given the podiatrist the fax number that morning and that she could not "control personnel or the fax" (*id.*).

On February 22, 2010, the plaintiff returned the accommodation request form to HR, stating she needed to wear shoes to prevent pain from heel spurs (doc. 42-1, Padgett decl. ¶ 6 & doc. 42-2, ex. 4 at pp. 16-17). The plaintiff's podiatrist faxed a letter stating the plaintiff would need the shoes for six months and maybe longer depending on her prognosis (*id.*, ex. 4 at pp. 19-20). On February 24, 2010, Ms. Padgett approved the plaintiff's request to wear "tennis/Merrill hiker/New Balance" type shoes for six months, at which time the accommodation request would be re-evaluated (*id.*, ex. 4 at pp. 21-22). On August 17, 2010, the accommodation was extended indefinitely (*id.*, ex. 4 at pp. 23-24).

The plaintiff received her second performance review on June 24, 2010, but it was the first review of her performance in her new role in the cost accounting department (doc. 41-1, def. first req. for admissions ¶ 14). Mr. Cotran gave the plaintiff similar ratings as had Mr. Baker, i.e., an overall rating of 3.0 ("meets expectations"), with "needs improvement" ratings in the areas of "communications" and "working with others" and noted

that the plaintiff needed "to soften her communication skills and make sure [oral and written communication] was done in a courteous and professional manner" (*id*.). As part of the performance review, Mr. Cotran and Mr. Dotson created a detailed development plan for the plaintiff to follow in improving her overall performance (doc. 41-1, def. first req. for admissions ¶¶ 10,14). When she received her performance review, the plaintiff complained that the "performance skills" rating was not accurate and that her skills associated with her master's degree in database technologies was "depreciated" (*id*. ¶ 14).

On June 25, 2010, Ms. Padgett met with Wilma Beck, the plaintiff's co-worker, who complained that the plaintiff was rude to her and to co-worker Tina Schmidt (doc. 42-1, Padgett decl. ¶ 7). Ms. Beck said that the plaintiff told her that Ms. Schmidt "is not smart enough to be in a Master's program" and that Mr. Cotran was not a good manager (*id*.). During a meeting the day before, Mr. Cotran had questioned the plaintiff about her work, and she responded, "I've told you 5 times" (*id*.). Ms. Beck thought the plaintiff was very disrespectful to Mr. Cotran (*id*.). Ms. Padgett followed up with Mr. Cotran, who confirmed that the plaintiff was disrespectful to him and very abrupt to people (*id*.).

On August 27, 2010, a manager and three employees reported to Mr. Cotran that the plaintiff was asleep in her cubicle (doc. 42-1, Padgett decl. ¶ 8 & doc. 42-2, ex. 5 at p. 2). On August 31, 2010, Mr. Cotran talked to the plaintiff about the incident, and she admitted being asleep because she was tired (*id.*, ex. 5 at p. 6). On September 14, 2010, Mr. Cotran received a report that the plaintiff was being rude to Information Systems ("IS") employees at the help desk. Mr. Cotran spoke with the affected employees who confirmed that the plaintiff yelled at them on the phone. The plaintiff had told them, "Look, I've got a Master's degree in IT so I know what I am doing" (doc. 42-1, Padgett decl. ¶ 8 & doc. 42-2, ex. 5 at pp. 3-5).

On October 7, 2010, Ms. Padgett met with the plaintiff regarding the sleeping incident because the plaintiff had complained to Mr. Cotran about a rash on her neck and

later mentioned headaches and blurred vision (doc. 42-1, Padgett decl. ¶ 8 & doc. 42-2, ex. 5 at p. 10).  The plaintiff asked Ms. Padgett about the Family and Medical Leave Act ("FMLA") and pay under CDS's short term disability policy.  The plaintiff said she did not know what her medical condition was, but she suspected it was fibromyalgia, and she planned to see a doctor on October 10.  The plaintiff complained she was being penalized for having a medical condition.  Ms. Padgett gave the plaintiff an ADA accommodation request form (as she had done before) and FMLA certification paperwork and directed her to the policies on CDS's intranet (*id*.).  On October 12, 2010, the plaintiff returned the completed FMLA paperwork to Ms. Padgett (*id.*, ex. 5 at pp. 9-13).  On the paperwork, the doctor stated that the plaintiff experienced sporadic migraine headaches causing blurred vision, dizziness, and inability to concentrate (*id.*, ex. 5 at p. 10).  The condition had manifested over 40 years before and was of unknown duration (*id*.).  The doctor estimated that the plaintiff would intermittently be unable to perform the essential functions of her job, up to 80 hours per month.[3]  On October 13, 2010, the plaintiff submitted an accommodation request to Ms. Padgett for a computer screen filter and the elimination of fluorescent lights (*id.*, ex. 5 at pp. 14-15).  Ms. Padgett acknowledged receipt and told the plaintiff she would await medical information from the plaintiff's doctor about the accommodation request (*id.*, ex. 5 at p. 14).

On October 20, 2010, the plaintiff received a corrective action report for "exhibit[ing] unprofessional behavior" in violation of the Personal Conduct policy (doc. 41-1, def. first req. for admissions ¶ 4).  The impetus for the discipline was another report

---

[3] Although the physician, K. Greenfield, M.D., who appears to be a general practitioner at Doctor's Care, stated that the plaintiff also had fibromyalgia, Dr. Greenfield's October 21st letter to CDS stated that the plaintiff "possibly" had fibromyalgia (doc. 42-1, Padgett decl. ¶ 8 & doc. 42-2, ex. 5 at pp. 10, 16).  The plaintiff has not produced her medical records in response to the defendant's discovery requests, so it is unknown whether the plaintiff was diagnosed with fibromyalgia at the time or whether the plaintiff had reported to Dr. Greenfield that she had fibromyalgia.

(received by Mr. Cotran on October 12th) that the plaintiff had been rude to IS employees (doc. 42-2, Padgett decl., ex. 5 at p. 5). According to the report, during three incidents -- two phone calls and one in-person incident -- the plaintiff was loud, argumentative, rude, and unprofessional (doc. 41-1, def. first req. for admissions ¶ 4). During one of the calls, the IS employee's supervisor was also on the telephone and witnessed the plaintiff's behavior (doc. 41-2, SCDEW Tr. pp. 48-50, 74-76). In sworn testimony, Thomas Dunn, an employee who worked closely with the IS department, explained that he had spent four years building a relationship with IS so that the accounting area where the plaintiff worked would receive priority when in need of IS assistance, and the plaintiff's unprofessional behavior jeopardized the relationship (*id*.). Through the corrective action, the plaintiff was warned that a "[f]ailure to sustain improvement may result in further disciplinary action up to and including termination of employment" (doc. 41-1, def. first req. for admissions ¶ 4).

The plaintiff wrote a rebuttal to the information shared with her during the counseling meeting and said the IS employees did not know how to perform their jobs, that they were "threatened by [her] knowledge," and that Mr. Dotson was not properly supervising the area (*id*. ¶ 6). The plaintiff also stated she was "accused of not communicating," but she was "not being shown exactly the type of communication style or specific instance of correction they would like to see." Although the plaintiff used the terms "harassment" and "hostile work environment" in the rebuttal document, nothing else in the document indicated she was referring to harassment based on a disability or any other protected category. The plaintiff simply opined that she was correct in her arguments with the IS employees (*id*.).

On or after October 21, 2010, CDS received medical information supporting the plaintiff's accommodation request for migraine-related symptoms (doc. 42-1, Padgett decl. ¶ 10). CDS agreed to purchase the plaintiff a computer screen filter. The plaintiff chose the specific screen filter she wanted, and it was purchased for her on December 1,

2010.  When Ms. Padgett investigated the fluorescent lighting in the plaintiff's area, she discovered that the plaintiff was voluntarily using a fluorescent light bar that was mounted over her desk (*id.*).  Ms. Padgett offered to have the light bar removed, but the plaintiff said she would just stop using it (*id.* & doc. 42-2, Padgett decl., ex. 5 at pp. 16-21).  CDS also approved the plaintiff's three-month leave of absence request for surgery on her foot (doc. 42-2, Padgett decl., ex. 4 at p. 25) and granted her paid leave under CDS's short term disability policy (doc. 40-3, Thompson decl.).  The plaintiff ended up taking leave from December 15, 2010, until January 10, 2011, when her surgeon released her to return to work (*id.*).

On March 23, 2011, during a staff meeting with Mr. Dotson, Mr. Cotran, and her co-workers, the plaintiff was loud, argumentative, and confrontational (doc. 41-1, def. first req. for admissions ¶ 5).  The plaintiff created an uncomfortable environment that undermined the productivity of the meeting (*id.*).  Her co-worker Tina Schmidt was so unnerved by the plaintiff shaking papers and yelling at Mr. Cotran that she excused herself from the meeting (doc. 42-1, Padgett decl. ¶ 5 & ex. 3 at p.11).  Although Ms. Beck also wanted to leave, she remained in the room but could not concentrate on the substance of what was being said because the plaintiff was so hostile (*id.*, ex. 3 at pp. 9-10).  On March 25, 2011, Mr. Cotran placed the plaintiff on probation, explained again that her behavior violated the Personal Conduct policy, and warned her that the violation should never happen again (doc. 41-1, def. first req. for admissions ¶ 5; doc. 41-2, SCDEW Tr.  pp.16-18, 60, 88).  The plaintiff submitted a rebuttal to the disciplinary action (doc. 41-1, def. first req. for admissions ¶ 7).  In the rebuttal, the plaintiff acknowledged Mr. Dotson and Mr. Cotran's instruction that she must improve her communication style based on their perception and that of her co-workers that she was rude and abrupt (*id.*).  The plaintiff also acknowledged that Mr. Cotran asked her to communicate in person with him rather than through e-mail, but she expressed her resistance to that and complained that Mr. Cotran

was micromanaging her (*id.*). The plaintiff told Mr. Cotran she had "three advanced degrees." According to the plaintiff, Mr. Cotran explained "he was not concerned with the degrees." The plaintiff stated she could not work more collaboratively with Mr. Cotran without "more concrete parameters of acceptable behavior." The plaintiff also expressed resistance to improving her working relationship with Ms. Schmidt and Ms. Beck; based on the plaintiff's belief that they were frustrated with work and were seeking other employment, the plaintiff felt an improved relationship with them was futile (*id.*)

On March 28, 2011, Mr. Cotran provided the plaintiff with sections of the "Our Values" policy to provide her guidance on how he and Mr. Dotson expected her to communicate with them and with other employees (doc. 42-1, Padgett decl. ¶ 5). On April 22, 2011, Mr. Cotran told the plaintiff that Mr. Dotson wanted the team to use Excel rather than Visio (flowchart software) for creating flow charts, and he asked her if she had updated the EDC and CDC (doc. 42-1, Padgett decl., ex. 3 at p. 19). The plaintiff responded, "If I do not have Visio and you just sent this e-mail I could not have the updates done" (*id.* p. 20).

The plaintiff received a verbal corrective action report on May 3, 2011, and a "needs improvement" rating on her 2011 performance review issued on June 21, 2011 (doc. 41-1, def. first req. for admissions ¶¶ 9, 12). During the counseling session, Mr. Cotran addressed the plaintiff's outbursts, her communication, the disorganization of her desk, and her work performance (doc. 42-1, Padgett decl. ¶ 5 & ex. 3 at pp. 21-24). In the performance review, Mr. Cotran emphasized that the plaintiff had to improve significantly in communicating with her co-workers no later than July 31, 2011 (doc. 41-1, def. first req. for admissions ¶ 12). Mr. Cotran wrote that the plaintiff had performed the mechanical part of the cost allocations well, but "her communication issues with peers and disorganization" negatively impacted the results (*id.*). Mr. Cotran wrote further that the plaintiff's written and oral communication skills hindered her "from realizing her full Accountant IV potential."

Because of those issues, Mr. Cotran rated the plaintiff as "needs improvement" in the areas of dependability, organizational skills, leadership/influencing, and responsibility, and as "below expectations" in the areas of communications and working with others (*id*.). Mr. Cotran directed the plaintiff to take a company educational course in team effectiveness or communications such as "Effectively Working with Others" and to meet with him daily to discuss her work and improve her skills (*id*.). The plaintiff submitted a written rebuttal stating that she has a "law degree and passed the bar exam" and has "two other advanced degrees" (*id*. ¶ 13). The plaintiff's rebuttal further asserted the performance review minimized her contributions and asserted that she is an inherently organized person (*id*.). Later, during a meeting with Tom Dunn and Mr. Cotran, the plaintiff "started pointing her finger at Mr. Cotran and said, 'That's not the way it's supposed to be,' and she got very loud." Mr. Cotran said, "Please do not point your finger at me and please lower your tone." The plaintiff complied initially, but raised her voice again moments later (doc. 41-2, SCDEW Tr. p. 73).

On July 13, 2011, the plaintiff complained to Corporate Compliance Officer Bruce Honeycutt that she was having difficulty getting resolution from management related to irregular reporting (doc. 40-2, Allison decl. ¶ 2). CDS Compliance Officer Carolyn Allison investigated the plaintiff's complaints and found no evidence to support her allegations (*id*.). The Internal Audit Department conducted an independent investigation regarding the plaintiff's financial reporting issues (*id*. ¶ 3). Again, no evidence was found showing any irregularities (*id*.). On August 25, 2011, Ms. Allison informed the plaintiff of their findings (*id*. ¶ 4).

On August 30, 2011, Mr. Cotran was meeting in his office with Ms. Beck when he received a call from the plaintiff, which he answered on speaker phone. As the plaintiff's voice grew louder, Mr. Cotran picked up the receiver and instructed her to calm down. The plaintiff said, "You're not focused" and "You're not listening to me." Her voice was so loud

11

that Ms. Beck and other employees outside Mr. Cotran's office could hear her, and they later went to Mr. Cotran to ask if he was okay (doc. 41-2, SCDEW Tr. pp. 13-16, 86-87, 94-98, 102-105). Brian Gates, an HR Generalist, investigated the incident and interviewed six employees plus Mr. Cotran, Mr. Dotson, and the plaintff. All employees confirmed that the plaintiff's communication and behavior were demeaning, argumentative, affected the entire department, and created an uncomfortable working environment (*id.* pp. 31, 55-58, 61, 85-87). At the completion of the investigation, HR concluded that the plaintiff "exhibited inappropriate behavior by using a loud tone of voice [and] behaving in a rude and disrespectful manner towards [her] manager" (doc. 41-1, def. first req. for admissions ¶ 3). CDS discharged the plaintiff effective September 9, 2011, because of her ongoing violations of the Personal Conduct policy (*id.*)

The plaintiff states in her affidavit that she was diagnosed as having social anxiety disorder over ten years ago. She claims the disorder causes her to have a fear of interacting with strangers, a fear of situations in which she might be judged, and difficulty in talking. She claims that her physical symptoms caused by this disorder include trembling and shaking, upset stomach and nausea, difficulty in modulating her voice, and difficulty in sleeping. The plaintiff states that shortly after she started to work with Mr. Cotran she told him and Tina Schmidt about her disorder. She does not remember the exact date of the conversation. She further claims that when Mr. Cotran sent her to talk to Ms. Padgett about her difficulties at work, which included falling asleep, she attempted to explain to Ms. Padgett that she had social anxiety disorder and attempted to explain to her what accommodations she needed to be able to perform her job. However, the plaintiff claims Ms. Padgett got angry with her and told her that the defendant only recognized certain disabilities and gave her a list of disabilities "recognized" by the defendant, which did not include social anxiety and sleep disorders. The plaintiff further alleges that after she disclosed to the employee compliance hotline that she was being required to prepare false

12

financial statements, Mr. Gates met with her to discuss her difficulties in interacting with supervisors and co-workers. She claims Mr. Gates got very hostile, refused to recognize her problem, and instead "started screaming" at her. The plaintiff contends that her disorder causes her to have difficulty in speaking and in controlling the volume of her voice, which is a particular problem when she is participating in a phone call, when she has difficulty hearing, and when stress is introduced to the discussion. The plaintiff claims that she has told Mr. Cotran and Ms. Schmidt and attempted to tell Ms. Padgett and Mr. Gates about this problem and that when they were discussing business related matters she could get unusually frustrated if she perceived they were not listening to what she was trying to explain. The plaintiff claims that, rather than offering her an accommodation for her problem, Mr. Cotran and other supervisors deliberately treated her in a way that they knew would trigger her anxiety and then would reprimand her for getting upset (doc. 49-1, pl. aff. ¶¶ 3-11).

## APPLICABLE LAW AND ANALYSIS

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) scheme of proof applies to claims under the ADA. *Ennis v. National Ass'n of Business and Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995). Accordingly,

> [T]he plaintiff has the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. If the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. If the defendant meets this burden of production, the presumption created by the *prima facie* case "drops out of the picture," and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination.

*Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

To establish a *prima facie* claim of disability discrimination under the ADA, the plaintiff must prove (1) she had a disability as defined by the ADA; (2) she was a "'qualified individual,'" i.e., able to perform the essential functions of her job with or without reasonable accommodation; and, (3) her employer took an adverse action against her on account of her disability. *Young v. United Parcel Serv., Inc.*, 707 F.3d 437, 443 (4th Cir. 2013) (quoting 42 U.S.C. § 12112(a)). "The ADA provides three avenues of establishing the existence of a disability: '(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.'" *Id*. (quoting 42 U.S.C.. § 12102(1)).

The plaintiff's complaint alleges she was terminated because of an unidentified physical disability (doc. 1-1, comp. ¶ 45). The complaint further alleges the plaintiff "has a physical impairment that substantially limits one or more of her major life activities" (*id*. ¶ 24), and that CDS used those "physical limitations as an excuse to claim Plaintiff engaged in improper conduct and terminated Plaintiff because of her physical limitations" (*id*. ¶ 27). Accordingly, the plaintiff is proceeding under the first avenue of establishing the existence of a disability. The regulations describe the following types of activities that must be affected in order to qualify as major life activities: "Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i).

There is no evidence that the plaintiff's foot issue (requiring accommodation of comfortable shoes and time off for surgery) and potential for migraines (requiring accommodation of a computer screen filter) limited a major life activity. Moreover, in response to the motion for summary judgment, the plaintiff does not argue that a *physical* condition caused her discharge. Rather, she now claims that the defendant terminated her

from employment because of a *mental* condition - social anxiety disorder.  However, the plaintiff has submitted absolutely no medical evidence that she has even been diagnosed with social anxiety disorder.  Further, she has not produced any medical records to CDS despite CDS's request for her records[4] and the undersigned's January 17, 2014, order granting CDS's unopposed motion to compel (*see* doc. 34).  According to the plaintiff's response to the defendant's interrogatories, she has not sought treatment, medications, or consultations since January 1, 2008, for social anxiety disorder (doc. 51-2 at p. 5).  "A plaintiff must provide medical evidence, not just subjective opinion, of the effect that the impairment has on her activities." *Wilson v. Carolina Power & Light Co.*, No. 4:05-3597-TLW-TER, 2009 WL 2885823, at *8 (D.S.C. Sept. 2, 2009) (plaintiff's affidavit and deposition testimony were "merely his subjective opinion and not medical evidence" and were insufficient to establish he had a disability as defined by the ADA) (citing *Pollard v. High's of Baltimore*, 281 F.3d 462, 469–70, n.3 (4th Cir. 2002) and *Stewart v. Weast*, 228 F. Supp. 2d 660, 662 (D. Md. 2000)).  Here, the plaintiff has offered nothing other than her subjective opinion and has failed to show that she has a disability as defined by the ADA.

Next, the plaintiff must establish that, at the time of her termination, she could perform the essential functions of her job with or without reasonable accommodation. *See EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 379 (4th Cir. 2000) ("[T]he date of an adverse employment decision is the relevant date for determining whether a plaintiff is a "'qualified individual with a disability.'") (citation omitted). While the plaintiff states in her opposition to the motion for summary judgment that "[t]he accommodation [she] sought was simply to not be placed in situations where her input was deliberately ignored" (doc. 49 at

---

[4]On January 30, 2014, the plaintiff responded to the defendant's request for her medical records by stating she did not have copies of the records, but would sign an authorization for the defendant to obtain copies (doc. 51-3 at p. 3) According to the defendant, she has never provided a signed authorization or the records. The defendant has filed a motion for sanctions based on the plaintiff's failure to fully respond to written discovery requests and failure to appear for her deposition (*see* doc. 52).

p. 8), the portion of her declaration cited does not support this assertion. In paragraph 11 of her declaration, the plaintiff does not state that she *requested* an accommodation; rather, she complains that the defendant did not *offer* her an accommodation for her problem" (doc. 49-1, pl. decl. ¶ 11). Moreover, in her prior sworn testimony in her unemployment hearing, the plaintiff testified that she did not request an accommodation for social anxiety disorder (doc. 41-2, SCDEW Tr. p. 119). As argued by the defendant, it had no duty to provide a reasonable accommodation or even engage in the interactive process until the plaintiff specifically requested an accommodation that she tied to a stated disability. "The duty to engage in an interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability." *Wilson v. Dollar General Corp.*, 717 F.3d 337, 346-47 (4th Cir. 2013); *accord Woods v. Boeing Co.*, No. 2:11-cv-02855–RMG, 2013 WL 5308721, at *2 (D.S.C. Sept. 19, 2013). *See Higgins v. Maryland Dept. of Agriculture*, C.A. No. L-11-0081, 2012 WL 665985, at *6 (D. Md. Feb. 28, 2012) (finding that the plaintiff had not shown he could perform the requirements of his job because, in part, he never approached his employer "to disclose the details of his impairment and initiate a dialogue by requesting an accommodation that might overcome the obstacle posed by it"). Thus, the relevant question is whether the plaintiff could perform the essential functions of her job without an accommodation.

In her sworn testimony before the SCDEW, the plaintiff admitted that professional, respectful work behavior was essential (doc. 41-2, SCDEW Tr. pp. 141-42). She also alleged in her complaint that she could satisfy the essential functions of her position (doc. 1-1 ,comp. ¶ 26). However, the undisputed evidence cited above shows that, in the eyes of management and her co-workers, the plaintiff was not capable of professional communication. While the plaintiff contends that her alleged mental impairment caused her behavior, the defendant has no obligation under the ADA to overlook or accommodate rude

behavior or insubordination. *See Darcangelo v. Verizon Maryland, Inc.*, 189 F. App'x 217, 219 (4th Cir. 2006) ("[T]he ADA does not require [an employer] to subject its employees to [the plaintiff's] abusive behavior . . ., even if that behavior was related to her bipolar disorder."); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir.1999) ("[T]he ADA confers no right to be rude"). *See also Halperin v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 465 (4th Cir. 2012) (applying Title III of the ADA and holding that misconduct or unprofessional behavior, whether related to disability or not, may be the basis for dismissal from a covered program). Moreover, as the District of Maryland recently stated:

> [E]mployers are not required to tolerate abusive behavior by a disabled individual, even if the behavior is related to the disability. *See Darcangelo*, 189 F. App'x at 219. Indeed, "[t]he law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability." *Jones v. Am. Postal Workers Union Nat'l*, 192 F.3d 417, 429 (4th Cir.1999) (internal citations omitted).

*Higgins*, 2012 WL 665985, at *7.

The plaintiff also cannot establish that the defendant terminated her employment on account of her disability. *See Young*, 707 F.3d at 443. The plaintiff argues that the "[d]efendant discharged [her] for the exact conduct which was triggered by her disability" (doc. 49 at p. 8), and thus the final factor of her *prima facie* case is satisfied. However, as discussed above, the defendant was not required to tolerate the plaintiff's rude and disrespectful behavior, even the behavior was related to her alleged disability.

Even if the plaintiff could establish a *prima facie* case of discriminatory discharge under the ADA, she cannot show that the nondiscriminatory explanation given for her discharge was a pretext for disability discrimination. As argued by the defendant, the record is replete with evidence that it accommodated the plaintiff's known medical conditions, i.e., her foot condition and migraines, permitting her to wear comfortable shoes due to her foot injury and giving her a special computer screen filter of her choice to help

17

alleviate her headaches. Here, there is no evidence to suggest that the defendant terminated the plaintiff's employment for any reason other than her continued unprofessional behavior. As the ADA does not require an employer to ignore such misconduct, summary judgment should be granted.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing,

IT IS RECOMMENDED that the defendant's motion for summary judgment (doc. 40) as to the plaintiff's remaining claim for violation of the ADA be granted. Moreover, the undersigned has considered the defendant's motion for sanctions (doc. 52) based upon the plaintiff's failure to cooperate in discovery, including her failure to produce medical records and to verify interrogatory responses. As the undersigned recommends that the case be dismissed pursuant to Rule 56 as discussed above, the defendant's request for dismissal of the case pursuant to Federal Rules of Civil Procedure 37 and 41 is moot. Moreover, the undersigned recommends that the defendant's request for attorney fees related to the filing of previous motions to compel be denied.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

August 26, 2014
Greenville, South Carolina